**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| MARYLAND AND VIRGINIA MILK PRODUCERS COOPERATIVE ASSOCIATION, INCORPORATED d/b/a MAOLA,<br><br>    Plaintiff,<br><br>vs.<br><br>GLEZEN FARMS, LLC,<br><br>    Defendant. | Case No. 1:26-cv-1574 |

**COMPLAINT**

Plaintiff Maryland and Virginia Milk Producers Cooperative Association, Incorporated d/b/a Maola ("MDVA" or the "Cooperative"), by counsel, files this Complaint against Defendant Glezen Farms, LLC ("Glezen") and alleges as follows:

**PARTIES**

1.    MDVA is a Virginia agricultural cooperative association engaged in handling and marketing milk produced by hundreds of member farms located in multiple states, including Virginia, Maryland, Pennsylvania, North Carolina, and New York.

2.    MDVA is organized under Virginia law, has the capacity to sue and be sued, and maintains its principal place of business in Herndon, Virginia. MDVA does business under the trade name Maola.

1

3.      Glezen is a New York limited liability company with a principal and/or service address at 149 Owen Hill Road, Lisle, New York 13797. Glezen also operates the dairy farm identified in the parties' agreement at 1085 Caldwell Hill Road, Lisle, New York 13797.

4.      At all relevant times, Glezen was a dairy producer, a member-producer of MDVA, and a party to a written milk marketing agreement with MDVA, as amended by a written term-extension agreement. That agreement, as amended, is defined below as the Amended Milk Marketing Agreement or Amended MMA.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. MDVA is a Virginia agricultural cooperative association with its principal place of business in Herndon, Virginia. Glezen is a New York limited liability company with a principal address in New York, and, upon information and belief, all members of Glezen are citizens of New York. Complete diversity of citizenship therefore exists between the parties. MDVA's estimated liquidated damages alone exceed $3,200,000.

6.      This Court has personal jurisdiction over Glezen under Virginia Code § 8.01-328.1(A)(1) and (A)(2) because this action arises from Glezen's transaction of business in Virginia, supplying of milk to a Virginia corporation and voluntary entry into, performance under, and extension of an ongoing membership and milk-marketing relationship administered in Virginia. Glezen knowingly entered an ongoing contractual and cooperative relationship with a Virginia entity, accepted the benefits of that relationship, and undertook continuing obligations that were administered, governed, and enforced in Virginia.

7.     Venue is proper in this District and Division under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to MDVA's claims occurred in this District, including MDVA's administration of the parties' cooperative and contractual relationship, receipt and processing of Glezen's performance, and the harm MDVA suffered from Glezen's breach, all of which were centered at MDVA's principal place of business in Herndon, Virginia, within the Eastern District of Virginia. Venue in the Alexandria Division is proper because Fairfax County, where MDVA maintains its principal place of business and where those events occurred, falls within this Division. Venue is also proper under 28 U.S.C. § 1391(b)(3) because Glezen is subject to personal jurisdiction in this District. Assignment to the Alexandria Division is further appropriate because the claims arise from events and omissions occurring in Fairfax County, Virginia, which is within this Division, and MDVA maintains its principal place of business in Herndon, Virginia, within Fairfax County.

## BACKGROUND

8.     Fluid milk has characteristics that distinguish it from other agricultural commodities. It is highly perishable, produced every day, and difficult to store on the farm for extended periods. As a result, dairy farmers must have their milk transported off the farm frequently, often daily or every other day, regardless of prevailing market conditions.

9.     These features limit an individual producer's ability to withhold supply, wait for better pricing, or negotiate on equal footing with milk buyers. Dairy cooperatives developed in response to those market realities by allowing dairy producers to coordinate the marketing, transportation, pricing, and sale of their milk through collective action.

10.     MDVA is a farmer-owned dairy cooperative headquartered in Herndon, Virginia and founded in 1920. Through the cooperative structure, hundreds of independent dairy farm

3

families collectively market their raw milk through MDVA, and MDVA undertakes forward-looking obligations involving marketing, supply balancing, transportation, payment administration, processing capacity, and commitments to downstream customers.

11.    MDVA operates as both a collective marketing organization and an integrated dairy supply chain. It processes and markets raw milk and dairy products, including through the Maola brand and third-party private-label channels, enabling member-producers to benefit from economies of scale, more consistent marketing, and shared participation in cooperative returns.

12.    Because raw milk must be continuously marketed and processed, MDVA relies on stable and predictable member milk supply to allocate production, meet customer demand, avoid waste, avoid supply shortfalls, preserve processing and transportation efficiencies, and protect the value of the cooperative for all member-producers. MDVA's cooperative model depends on members honoring their marketing commitments.

## FACTUAL ALLEGATIONS

### Virginia Agricultural Cooperative Association Act

13.    MDVA is organized under the Virginia Agricultural Cooperative Association Act (the "Act"), Virginia Code § 13.1-312 et seq. That Act authorizes agricultural cooperative associations to engage in cooperative activities for producers of agricultural products in connection with producing, assembling, marketing, buying, selling, handling, transporting, shipping, or utilizing agricultural products and by-products, as well as furnishing business and other services on a cooperative basis.

14.    The Act authorizes agricultural cooperative associations to act as agent, broker, or attorney-in-fact for their members; to make contracts; to make loans or advances to members or

producer-patrons; to establish reserves and surplus; to sue and be sued in the association's corporate name; and to conduct business in the Commonwealth of Virginia and elsewhere.

15.    Under Virginia Code § 13.1-321, membership in an agricultural cooperative association is limited to bona fide producers of agricultural products and cooperative associations of such producers, and a member who loses membership remains subject to liabilities incurred while a member of the association.

16.    Virginia Code § 13.1-329 expressly authorizes agricultural cooperative associations and their members to make and execute marketing contracts requiring members to sell, for a period not over ten years, all or any specified part of their agricultural products or specified commodities exclusively to or through the association.

17.    Virginia Code § 13.1-329 further provides that the bylaws and marketing contract may fix, as liquidated damages, specific sums to be paid by a member to the association upon breach of provisions regarding the sale, delivery, or withholding of products, and that such provisions are valid and enforceable in the courts of the Commonwealth.

18.    Virginia Code § 13.1-329 also provides that, in the event of a breach or threatened breach of such a marketing contract by a member, the association is entitled to injunctive relief to prevent further breach and to a decree of specific performance.

### The Milk Marketing Agreement

19.    Glezen knowingly entered an ongoing contractual and cooperative relationship with MDVA, a Virginia cooperative, accepted the benefits of that relationship, and undertook continuing obligations that were administered, governed, and enforced in Virginia. Prior to joining MDVA, Glezen was a member of another dairy cooperative that was experiencing financial difficulties and struggling to market its members' milk. As a result, Glezen's hauling charges

through its former cooperative had increased from approximately $1.00 per hundredweight to upward of $4.00 per hundredweight. Facing those conditions, Scott Glezen, a principal of Glezen, reached out to MDVA on or about March 31, 2023, seeking MDVA membership and milk-marketing services. In connection with joining MDVA, Glezen represented that it was seeking a stable, long-term milk market.

20.    On or about June 1, 2023, MDVA and Glezen entered into a written membership and marketing agreement (the "Milk Marketing Agreement" or "MMA"). A true and correct copy of the MMA is attached hereto as Exhibit A. The MMA incorporated MDVA's Articles of Incorporation, Bylaws, and rules and regulations ("Cooperative Governance Documents") then in effect or later amended. Ex. A, p. 3 § 13.

21.    Under the MMA, Glezen became a member-producer of MDVA and agreed to have MDVA manage and market Glezen's milk in accordance with the parties' contractual relationship, MDVA's Cooperative Governance Documents and the Act. Section 13 of the MMA provides that MDVA's Board of Directors is the sole arbiter of issues relating to performance of the agreement and construction of MDVA's Cooperative Governance Documents, with the Board's decision final and binding. Ex. A, p. 3 § 13. By joining MDVA as a member-producer, Glezen knowingly and voluntarily subjected itself to the rights, obligations, and remedies established by the MMA, MDVA's Cooperative Governance Documents, and the Act's statutory framework, including the exclusive marketing and liquidated damage provisions of Va. Code § 13.1-329.

22.    The MMA provided for an initial one-year term beginning on the date of Glezen's first shipment of milk under the MMA. Glezen first delivered milk to MDVA on or about June 16, 2023, making the initial term run from approximately June 16, 2023 through June 15, 2024. After the first year, the MMA was subject to automatic renewal for successive one-year periods unless

6

canceled by either party by written notice at least thirty days before expiration of the then-current term. Ex. A, p. 2 § 9.

23.     Glezen's principal responsibility under the MMA was to deliver to MDVA, or to another place designated by MDVA, all marketable milk produced on the farm identified in the agreement, except only quantities required for home or farm use. Glezen also agreed to produce milk in compliance with applicable laws and regulations and to deliver milk in pure, unadulterated condition suitable for sale or processing. Ex. A, p. 2 §§ 4-5.

24.     MDVA's principal responsibility under the MMA was to market Glezen's milk. MDVA agreed to market Glezen's milk at the best price obtainable under market conditions, in MDVA's sole discretion, and to perform appropriate tests and procedures to determine the quality and quantity of milk delivered. Ex. A, p. 2 §§ 7-8.

### Breach Provisions in the MMA

25.     The MMA sets forth specific remedies if Glezen breaches its obligation to sell all marketable milk to MDVA. The agreement provides that, because MDVA's legal remedy would be inadequate and because actual damages would be impractical and extremely difficult to determine if Glezen failed to sell all marketable milk as required, Glezen agreed to pay MDVA liquidated damages of $2.00 per hundredweight of milk not sold to MDVA during the term of the agreement. The agreed liquidated-damages rate reflects the parties' advance estimate of harm from premature withdrawal and diversion, including, without limitation, anticipated market losses, lost opportunities, disruption to cooperative supply planning, balancing obligations, processor commitments, transportation coordination, plant utilization, and harm to cooperative operations and relationships. Ex. A, p. 3 § 11.

26.    The MMA further provides that, in the event Glezen breaches any material provision of the agreement - particularly the provision requiring Glezen to sell its milk to MDVA - MDVA may seek injunctive relief to prevent further breach, specific performance of the agreement, and full damages for the breach. Ex. A, p. 3 § 11.

27.    The MMA also states that it is one of a series of marketing agreements whose value depends on adherence by all contracting parties. That provision reflects the cooperative structure underlying the parties' relationship: MDVA's ability to market milk effectively depends on member-producers honoring their exclusive delivery and marketing commitments. Ex. A. p. 3 § 11.

**The Amended MMA and Sustainability Program Benefits**

28.    MDVA has made sustainability an important part of its cooperative model. In furtherance of that commitment, MDVA works with governmental, nonprofit, and commercial partners to identify programs, grants, incentives, and other sustainability opportunities for member farms. These opportunities are designed to help dairy farmers improve conservation activities, adopt conservation best management practices, and increase the sustainability of their farming operations.

29.    The benefits of those sustainability programs are substantial and long-lasting. They can include financial payments, cost-share funds, in-kind assistance, conservation investments, and farm improvements that continue to benefit the recipient member and its farm for years. Glezen itself identified the farm infrastructure improvements it sought through MDVA's sustainability programs, including milk silos, manure separation, manure ponds, and other capital items. Ex. B.

30.    Because MDVA invests time, staff resources, cooperative relationships, and administrative effort to locate, coordinate, and administer these opportunities, MDVA asks

member-producers who seek to participate in certain sustainability programs to commit to remain members and continue marketing their milk through MDVA for an extended period. That extended commitment protects the cooperative and the other member-producers who rely on stable supply while the recipient farm receives long-term sustainability benefits.

The Sustainability Agreement

31.    Glezen voluntarily elected to participate in MDVA-facilitated sustainability opportunities. On or about October 31, 2023, MDVA and Glezen entered into a written Sustainability/Conservation Beneficiary Agreement (the "Sustainability Agreement"). A true and correct copy of the Sustainability Agreement is attached hereto as Exhibit C.

32.    In the Sustainability Agreement, Glezen acknowledged that MDVA had been working with governmental and nonprofit organizations to locate programs, grants, and other incentives to assist dairy farmers in improving conservation activities and adopting conservation best management practices on their farms. Glezen further acknowledged that, because of MDVA's efforts, certain members were able to participate in conservation programs that provided benefits to those members and their farms, and that such benefits last many years. Ex. C, Recitals.

33.    Glezen also expressly acknowledged that it had benefited from participating in one or more conservation programs facilitated by MDVA. In consideration of those benefits, Glezen agreed to continue fully complying with all obligations under its previously executed MMA, which Glezen acknowledged remained in full force and effect. Ex. C §§ 1–2.

34.    Before Glezen executed the Sustainability Agreement, MDVA expressly told Glezen that producers receiving sustainability funding of $100,000 or more through MDVA were asked to extend their marketing contracts.

9

35.     The Sustainability Agreement amended the MMA by extending the MMA's renewable annual one-year term to a five-year term beginning October 31, 2023, and continuing through October 31, 2028. At the end of that five-year term, the MMA would revert to a renewable annual one-year term. Ex. C § 2.

36.     The MMA, as amended by the Sustainability Agreement, is referred to herein as the "Amended Milk Marketing Agreement" or "Amended MMA."

37.     Under the Amended MMA, Glezen was obligated to sell and deliver all marketable milk to MDVA through October 31, 2028. Glezen could not terminate the Amended MMA or discontinue performance before that date without breaching the Amended MMA. Ex. A § 4; Ex. C §§ 2–3.

38.     The five-year extended term in the Amended MMA falls within the maximum contract period authorized for exclusive agricultural cooperative marketing contracts under Virginia Code § 13.1-329.

<u>MDVA-Facilitated Sustainability Benefits</u>

39.     Following Glezen's execution of the Sustainability Agreement, MDVA worked to identify, coordinate, and administer sustainability program opportunities suited for Glezen in reliance on Glezen's contractual commitment to remain a member and continue marketing all marketable milk through MDVA for the extended term.

40.     As a result of MDVA's efforts, Glezen received and became eligible to receive substantial sustainability-related benefits facilitated through MDVA, including MDVA's identification, coordination, and administration of sustainability funding and conservation opportunities for Glezen Farms related to farm infrastructure, manure management, conservation practices, and other improvements intended to provide long-term operational benefits.

41.     Among other things, in November 2024, MDVA's Field Representative and Sustainability Specialist sent Glezen an application for $75,000 in additional funding to supplement the Starbucks cost-share program, which Glezen's representative completed and returned to MDVA within the week. Ex. D. In December 2024, MDVA's Field Representative and the Alliance for the Chesapeake Bay coordinated a visit to Glezen Farms to complete enrollment paperwork for the Conservation Innovation Fund and to load Glezen's fields into the Conservation Innovation Fund enrollment portal. Ex. E. In January 2025, MDVA connected Glezen with MDVA staff to assist Glezen with questions regarding the New York Dairy Modernization grant. Ex. F. On April 1, 2025, Glezen executed a Cost Sharing Agreement ("CSA"), a formal written contract under which MDVA committed Starbucks-funded project funds for the manure storage facility at Glezen Farms—the same type of farm infrastructure improvement Glezen had previously identified as a priority sustainability investment. In May 2025, Glezen submitted a contractor invoice to MDVA requesting reimbursement through MDVA's Starbucks cost-share program for a completed manure project, stating that the manure project had been completed. Ex. G. In May 2025, Glezen received notification that its application to the New York State Dairy Modernization Grant Program had been approved for funding through the Farm and Food Growth Fund and the Hudson Valley Agribusiness Development Corporation, which MDVA had facilitated; Glezen forwarded that approval and related grant-program follow-up communications to MDVA in June 2025. Exs. H–I. In June 2025, Glezen was actively participating in the Starbucks Sustainable Dairy program, including data collection and scheduling of an environmental modeling report-out meeting coordinated through MDVA and Eocene Environmental Group. Ex. J. In August 2025, just two months before Glezen served its termination notice, Glezen participated in scheduling a

11

site visit to the farm to update silage leachate engineering plans in order to access available NFWF funds coordinated through MDVA. Ex. K.

42.     In addition to financial awards, Glezen retained lasting physical improvements to its farm facilitated through MDVA's sustainability programs, including a roller/crimper, a 40,000-gallon milk storage silo, and a manure storage tank.

<u>Glezen's Continued Participation Before Termination</u>

43.     In spring and summer 2025, months before Glezen's termination notice, Glezen continued to work cooperatively with MDVA and did not claim that MDVA had materially breached the parties' agreements.

44.     Glezen also continued participating in MDVA-sponsored recognition opportunities shortly before its termination notice. In April 2025, MDVA nominated Glezen for the Leopold Conservation Award, and Glezen's representatives actively participated in the nomination process by completing the application and corresponding with MDVA about submission details as late as April 30, 2025. In August 2025, MDVA's Field Representative and Sustainability Specialist, who had worked closely with Glezen Farms for more than two years, submitted a letter of recommendation nominating Glezen Farms for the National Dairy FARM Workforce Development Award administered by the National Milk Producers Federation. Exs. L–M.

45.     Glezen's execution of the CSA, its continued participation in MDVA-facilitated sustainability programs, and its participation in MDVA-sponsored recognition opportunities as recently as August 2025 are inconsistent with any claim that Glezen was then treating MDVA as having already committed a material breach of the Amended MMA.

46.     On October 31, 2025, Scott Glezen notified MDVA in writing that Glezen intended to terminate the Amended MMA and its cooperative membership effective January 1, 2026, and that Glezen's last full day as a member would be December 31, 2025.

47.     Scott Glezen stated that the decision was not made lightly and expressed appreciation for the support and services provided during Glezen's time with MDVA.

48.     Glezen's October 31, 2025 notice did not identify any alleged breach or failure of performance by MDVA as a basis for termination. Glezen first asserted that contention only after MDVA invoked its contractual rights under the Amended MMA.

49.     No subsequent amendment or modification was made to the Amended MMA to rescind the extended term or revise Glezen's obligation to sell and deliver all marketable milk to MDVA through October 31, 2028. Ex. A § 14; Ex. C § 2.

**Glezen's Hauling Concerns and MDVA's Good-Faith Efforts to Address**

50.     Glezen independently reached out to and met with the owners of L&M Ag Hauling on or about September 5, 2023, obtained basic hauling rates to multiple MDVA customer destinations, and shared those rates with MDVA. MDVA discussed with Glezen whether L&M Ag Hauling could be used either through a direct self-haul/self-pay arrangement or as a contract hauler paid through deductions from Glezen's milk check.

51.     In those discussions, MDVA consistently and repeatedly told Glezen that, regardless of the hauling structure, Glezen's milk still had to be available for delivery where MDVA needed it delivered, whether to a New York plant or to any other MDVA customer plant in the Mid-Atlantic included on the rate list Glezen had shared with MDVA. MDVA did not agree that Glezen could restrict deliveries to nearby New York plants or unilaterally control destination decisions inconsistent with MDVA's marketing obligations and customer commitments.

13

52.     Glezen considered both a self-haul/self-pay arrangement and a cooperative hauling arrangement with L&M Ag Hauling. On at least two occasions, Glezen elected not to pursue a self-haul/self-pay arrangement because Glezen was not comfortable that its milk would always deliver locally and was concerned that its actual blended delivery costs might be higher than the pooled hauling costs available through the cooperative. Glezen instead asked MDVA to pursue L&M Ag Hauling as a cooperative hauler. MDVA did so, and in or about October 2023, MDVA reached terms with L&M Ag Hauling for it to haul Glezen's milk.

53.     Beginning on or about November 1, 2023, L&M Ag Hauling began hauling Glezen's milk for MDVA. Between June and October 2023, Glezen's haul rate had ranged from approximately $3.50 per hundredweight to $2.11 per hundredweight, with fluctuations driven by spot delivery opportunities to local New York plants. After the L&M transition, New York haul rates ranged from approximately $2.47 per hundredweight to $1.93 per hundredweight and averaged approximately $2.19 per hundredweight - competitive with or lower than the prior rates.

54.     At the time of that communication, Glezen did not identify any alleged breach or failure of performance by MDVA as a basis for termination; that contention appeared for the first time only after MDVA asserted its contractual rights.

55.     As late as October 21, 2025, MDVA understood Glezen to be seeking a business meeting to discuss potential improvements to its hauling situation, not to announce that it intended to discontinue performance in breach of the Amended MMA. On that date, an MDVA representative was at Glezen Farms for regulatory work, and Scott Glezen discussed arranging a meeting with MDVA concerning opportunities to improve Glezen's hauling situation. He did not state that Glezen intended to leave MDVA or market milk elsewhere.

14

56.     MDVA understood that a meeting would be scheduled for mid-November 2025. Although MDVA demonstrated its willingness to work with Glezen to improve its hauling within the framework of the Amended MMA, no such meeting took place. On October 31, 2025, before MDVA and Glezen could meet, Glezen notified MDVA in writing that Glezen would be leaving the Cooperative and its last full day as member would be December 31, 2025. Scott Glezen explained that "[t]his decision was not made lightly, and we appreciate the support and services provided to us during our time with MDVA. We value the relationships we have built and the quality of expertise and assistance we received."

### MDVA's Efforts to Resolve

57.     After receiving Glezen's October 31, 2025 notice of termination, MDVA did not accept the notice as a valid termination of the Amended MMA. Instead, MDVA responded in writing and advised Glezen that the MMA, as amended by the Sustainability Agreement, remained in full force and effect through October 31, 2028.

58.     MDVA explained that, under the Amended MMA, Glezen remained obligated to deliver all marketable milk produced on the Glezen farm to MDVA for the full extended term. MDVA further advised that Glezen's stated discontinuation of membership effective January 1, 2026 would constitute a material breach of the Amended MMA and would require payment of liquidated damages for milk volumes sold to third parties rather than to MDVA during the remaining term through October 31, 2028.

59.     In an effort to avoid litigation, MDVA requested that Glezen either withdraw its notice of discontinuation or confirm that it would pay liquidated damages of $2.00 per hundredweight on milk not sold to MDVA through October 31, 2028. MDVA also expressly

15

reserved all rights and remedies under the Amended MMA and applicable law, including the right to seek injunctive relief and other appropriate remedies.

60.    Glezen did not withdraw its termination notice. Instead, by letter dated December 11, 2025, Glezen asserted that MDVA had constructively breached the parties' agreement and that Glezen's continued performance had been discharged. Glezen's asserted grounds included alleged hauling issues, capital-retain and quality-premium objections, and objections relating to the Sustainability Agreement and sustainability-program benefits.

61.    In that same correspondence, Glezen acknowledged the central terms of the parties' agreements, including that the MMA obligated Glezen to deliver "all marketable milk" to MDVA, that the MMA contained a $2.00 per hundredweight liquidated-damages clause, and that the Sustainability Agreement extended the one-year term to a fixed five-year term during which Glezen committed to remain with MDVA.

62.    Glezen's December 11, 2025 letter also confirmed that its decision to leave MDVA was driven, at least in substantial part, by what Glezen described as a "substantial and immediate revenue opportunity" in another market. MDVA disputes that any such asserted market opportunity, or any of the other grounds asserted by Glezen, excused Glezen's contractual obligations or permitted Glezen to terminate the Amended MMA before October 31, 2028.

63.    After Glezen ceased performance effective January 1, 2026, the parties continued to exchange correspondence concerning the consequences of Glezen's breach, the calculation of liquidated damages, contractual setoff, mediation, and potential resolution.

64.    MDVA responded that Glezen's decision to cease performance effective January 1, 2026 was a breach of the Amended MMA giving rise to liquidated damages. MDVA further

16

stated that the MMA gave MDVA the right to offset amounts owed by a member against funds otherwise due to that member.

65. MDVA owed Glezen amounts for milk Glezen produced and delivered to MDVA in December 2025. As of January 2026, Glezen owed MDVA liquidated damages under the Amended MMA for milk not sold to MDVA after Glezen ceased delivering milk effective January 1, 2026. MDVA calculated Glezen's accrued liquidated damages for January 2026 at $109,596.06, based on Glezen's December 2025 production of 5,479,803 pounds, converted to hundredweight, and multiplied by the contractual liquidated-damages rate of $2.00 per hundredweight. Ex. A § 11.

66. MDVA made clear that the adjusted setoff reflected only liquidated damages accruing for January 2026 and did not waive or limit MDVA's right to recover all liquidated damages owed under the Amended MMA. Based on historical production, MDVA's estimated total liquidated damages through October 31, 2028 exceed $3,200,000, subject to proof and reconciliation.

67. MDVA further advised Glezen that, consistent with the Amended MMA, MDVA expected Glezen to regularly remit liquidated damages at the rate of $2.00 per hundredweight for all marketable milk sold to third parties during the unexpired term. MDVA also advised that, absent confirmation that Glezen would remit those amounts, agreement to mediate, or another substantial step toward resolution, MDVA would commence legal proceedings to enforce its contractual rights.

68. MDVA also made clear that liquidated damages continued to accrue while mediation was pending and that, unless Glezen provided reliable information regarding actual diversion volumes, MDVA's monthly damage estimates would be based on historical production data and remain subject to reconciliation.

17

69.    MDVA also expressed willingness to mediate the dispute promptly and in good faith and proposed escrow and other resolution mechanisms to permit mediation to proceed without waiving contractual rights.

70.    MDVA's post-notice communications confirm that MDVA did not waive, release, or excuse Glezen's obligations under the Amended MMA. Rather, MDVA consistently maintained that the Amended MMA remained enforceable through October 31, 2028, attempted to resolve the dispute without litigation, invited Glezen to provide actual production and diversion data, set off accrued liquidated damages against amounts otherwise owed for December 2025 milk, and reserved all rights to recover liquidated damages and pursue contractual, statutory, legal, and equitable remedies.

### Glezen's Diversion of Milk

71.    Glezen ceased selling and delivering its marketable milk to MDVA effective on or about January 1, 2026.

72.    Upon information and belief, after January 1, 2026, Glezen began selling, delivering, diverting, or otherwise marketing its marketable milk to one or more third parties instead of MDVA.

73.    Glezen's third-party milk sales and diversions are within Glezen's knowledge and control. MDVA is entitled to discovery and, as appropriate, an accounting or production of records sufficient to determine all marketable milk Glezen failed to sell to MDVA during the unexpired extended term of the Amended MMA.

74.    Based on historical production, including December 2025 production of approximately 5,479,803 pounds, MDVA calculated, based on available production data January 2026 liquidated damages at $109,596.06 and total liquidated damages for the unexpired term of

18

the Amended MMA in excess of $3,200,000, subject to reconciliation based on actual production and diversion data.

75.    MDVA has not waived, released, or excused Glezen's obligations under the Amended MMA or the liquidated-damages provision.

76.    Liquidated damages continue to accrue for each hundredweight of marketable milk that Glezen sells, delivers, diverts, or otherwise markets to third parties instead of MDVA during the unexpired term of the Amended MMA.

## COUNT I - BREACH OF CONTRACT

77.    MDVA incorporates by reference the allegations in paragraphs 1 through 76 as if fully set forth herein.

78.    The Amended MMA is a valid, binding, and enforceable written contract supported by consideration.

79.    The Amended MMA is also an agricultural cooperative marketing contract authorized by Virginia Code § 13.1-329 because it requires Glezen, a member-producer, to sell all marketable milk exclusively to or through MDVA for a period not exceeding ten years.

80.    The liquidated-damages provision in the Amended MMA is valid and enforceable under Virginia Code § 13.1-329(b), which authorizes agricultural cooperative bylaws and marketing contracts to fix specific sums payable as liquidated damages upon breach of provisions regarding the sale, delivery, or withholding of products.

81.    MDVA performed, substantially performed, or was ready, willing, and able to perform its obligations under the Amended MMA. Before it began diverting its milk to third parties on or about January 1, 2026, Glezen never asserted to MDVA that MDVA had breached its obligations under the Amended MMA. Glezen's asserted grounds for constructive breach,

19

including alleged hauling, retain, premium, operational, market-access, and sustainability-related objections, did not constitute a material breach by MDVA and did not discharge Glezen's performance obligations.

82.    Glezen materially breached the Amended MMA by, among other things, attempting to terminate the extended term effective January 1, 2026, ceasing to deliver and sell all marketable milk to MDVA, and selling, delivering, diverting, or otherwise marketing marketable milk to one or more third parties during the unexpired extended term.

83.    Glezen's breaches triggered the liquidated-damages provision requiring Glezen to pay MDVA $2.00 per hundredweight for all marketable milk not sold to MDVA during the unexpired term of the Amended MMA.

84.    The liquidated-damages provision is enforceable because, at the time of contracting, the damages that would result from Glezen's premature withdrawal and diversion of milk were impractical and extremely difficult to determine, and the agreed sum was a reasonable forecast of the harm to MDVA and the cooperative structure.

85.    As a direct and proximate result of Glezen's breaches, MDVA has suffered and continues to suffer damages, including liquidated damages through October 31, 2028 in an amount to be proven at trial, subject to reconciliation based on actual production and diversion data.

86.    MDVA is entitled to judgment against Glezen for breach of contract, liquidated damages, pre-judgment and post-judgment interest, costs, and all other relief allowed by law or contract.

## COUNT II - DECLARATORY JUDGMENT

87.    MDVA incorporates by reference the allegations in paragraphs 1 through 86 as if fully set forth herein.

20

88.    An actual, present, and justiciable controversy exists between MDVA and Glezen concerning the parties' rights and obligations under the Amended MMA.

89.    That controversy includes, among other issues, whether Glezen may terminate or discontinue performance before October 31, 2028; whether Glezen is obligated to sell all marketable milk to MDVA during the extended term; whether Glezen's third-party sales and diversions breach the Amended MMA; and whether Glezen owes liquidated damages of $2.00 per hundredweight for all marketable milk not sold to MDVA during the unexpired extended term.

90.    MDVA seeks a declaration that: (a) the Amended MMA remains valid and enforceable through October 31, 2028; (b) Glezen's cessation of performance effective January 1, 2026 and third-party milk sales or diversions constitute breaches of the Amended MMA; (c) the Amended MMA's liquidated-damages provision is valid and enforceable, including under Virginia Code § 13.1-329; and (d) Glezen is obligated to pay MDVA $2.00 per hundredweight for all marketable milk not sold to MDVA during the unexpired extended term, subject to proof and reconciliation of actual volumes.

## COUNT III – SPECIFIC PERFORMANCE AND INJUNCTIVE RELIEF

91.    MDVA incorporates by reference the allegations in paragraphs 1 through 90 as if fully set forth herein.

92.    The Amended MMA requires Glezen to sell and deliver to MDVA, or to another place designated by MDVA, all marketable milk produced on the farm identified in the Amended MMA, except quantities required for home or farm use, through October 31, 2028.

93.    The Amended MMA expressly provides that, in the event of Glezen's breach of any material provision - particularly the provision requiring Glezen to sell its milk to MDVA -

MDVA may seek injunctive relief to prevent further breach and specific performance of the agreement.

94.    Virginia Code § 13.1-329 likewise authorizes agricultural cooperative marketing contracts requiring members to sell agricultural products exclusively to or through the cooperative and provides that, in the event of breach or threatened breach of such a contract, the association is entitled to injunctive relief to prevent further breach and to a decree of specific performance.

95.    Glezen has breached and continues to breach the Amended MMA by selling, delivering, diverting, or otherwise marketing its marketable milk to one or more third parties instead of MDVA during the unexpired extended term.

96.    Glezen's continued diversion of milk threatens ongoing and irreparable harm to MDVA and its member cooperative structure, including loss of milk supply, disruption of customer commitments, loss of market opportunities, harm to cooperative operations, and injury to the value of MDVA's series of member marketing agreements.

97.    Money damages alone are inadequate because Glezen's ongoing breach affects MDVA's cooperative supply, customer relationships, production planning, marketing commitments, sustainability-program administration, and the reliance interests of MDVA and its member-producers.

98.    MDVA is entitled to temporary, preliminary, and permanent injunctive relief requiring Glezen to comply with the Amended MMA and prohibiting Glezen from selling, delivering, diverting, transferring, or otherwise marketing marketable milk to any person or entity other than MDVA, or another place designated by MDVA, during the unexpired term of the Amended MMA.

22

99.     MDVA is also entitled to specific performance requiring Glezen to perform its exclusive delivery and marketing obligations under the Amended MMA through October 31, 2028. Ex. A §§ 4, 11; Ex. C §§ 2–3.

100.    To the extent the Court determines that specific performance should be limited or unavailable for any portion of the remaining term, MDVA seeks temporary and permanent injunctive relief prohibiting further diversion to third parties, together with continuing accounting and liquidated damages.

## COUNT IV - EQUITABLE ACCOUNTING

101.    MDVA incorporates by reference the allegations in paragraphs 1 through 100 as if fully set forth herein.

102.    The Amended MMA requires Glezen to pay MDVA liquidated damages of $2.00 per hundredweight for all marketable milk not sold to MDVA during the unexpired term.

103.    Since on or about January 1, 2026, Glezen has sold, delivered, diverted, or otherwise marketed marketable milk to one or more third parties instead of MDVA.

104.    The volume of milk produced by Glezen, the volume sold or delivered to third parties, the identity of third-party purchasers, the dates of sale or delivery, the prices received, and related hauling, settlement, and payment records are uniquely within Glezen's possession, custody, and control.

105.    Without an accounting, MDVA cannot determine the full amount of liquidated damages owed by Glezen for milk not sold to MDVA during the unexpired extended term of the Amended MMA.

106. MDVA has estimated liquidated damages based on historical production information, including December 2025 production, but those estimates are subject to reconciliation based on actual production, sale, delivery, and diversion data.

107. Glezen should be required to provide a complete accounting of all milk produced, sold, delivered, transferred, diverted, or otherwise marketed from January 1, 2026 through the date of judgment and, if necessary, through October 31, 2028.

108. MDVA is entitled to an equitable accounting, including production of monthly production records, milk statements, settlement statements, hauling records, sales records, purchaser records, payment records, and all other documents sufficient to determine the volume of marketable milk Glezen failed to sell to MDVA during the unexpired term of the Amended MMA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Maryland and Virginia Milk Producers Cooperative Association, Incorporated d/b/a Maola respectfully requests that the Court enter judgment in its favor and against Defendant Glezen Farms, LLC and award the following relief:

A. Judgment in favor of MDVA and against Glezen for breach of contract of the Amended MMA;

B. Liquidated damages of $2.00 per hundredweight for all marketable milk Glezen failed to sell to MDVA during the unexpired extended term of the Amended MMA through October 31, 2028, in an amount to be proven at trial and presently estimated based on historical production to exceed $3,200,000, subject to reconciliation based on actual production and diversion data;

24

C.  A declaration that the Amended MMA is valid, binding, and enforceable through October 31, 2028; that Glezen's attempted termination, cessation of performance, and third-party milk sales or diversions constitute breach of the Amended MMA; and that the Amended MMA's liquidated-damages provision is valid and enforceable;

D.  Injunctive relief and/or specific performance requiring Glezen to comply with its exclusive delivery and marketing obligations under the Amended MMA and prohibiting Glezen from selling, delivering, diverting, transferring, or otherwise marketing marketable milk to persons or entities other than MDVA, or another place designated by MDVA, during the unexpired term of the Amended MMA;

E.  An equitable accounting and related records relief requiring Glezen to account for and produce records sufficient to determine all milk produced, sold, delivered, transferred, diverted, or otherwise marketed from January 1, 2026 through the unexpired term of the Amended MMA;

F.  Prejudgment and post-judgment interest as allowed by law;

G.  Costs, attorneys' fees, and litigation expenses to the extent recoverable by contract, statute, or other applicable law; and

H.  Such other and further relief as the Court deems just and proper.

Dated:  June 5, 2026                                       Respectfully submitted,


/s/*Alex Menendez*
Alex Menendez (VSB No. 395724)
WATKINSON MILLER PLLC
1100 New Jersey Ave SE, Ste. 910
Washington, DC 20003
(t) 202.842.2345
(f) 202.464.5317
amenendez@watkinsonmiller.com
Attorney for Maryland and Virginia Milk Producers
Cooperative Association, Incorporated